Good morning. Good morning. May it please the court. My name is Stephen Lubar and with me is James Linear and we represent the appellants in this matter. We're here today appealing the ruling of the District Court's motion to dismiss and this court should reverse that decision. The question before the District Court was a very straightforward one. Did the appellants allege sufficient facts that could have found that the primary beneficiary of appellee's labour was the appellant? The answer to that question unequivocally is yes and therefore the appellee's motion, as I said, should have been denied. Courts such as Ensley in this court have ruled that a training program can establish an employee-employer relationship upon which wages are due. As this court is aware, the purpose of a 12B6 motion is to test the sufficiency of a complaint, not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defences. Therefore, the District Court erred when it made findings of fact and weighed evidence trying to determine who was the primary beneficiary of appellant's labour. A motion dismissed can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts upon which a reasonable inference could be derived. Not only did the District Court fail to take the allegations set forth in the complaint as true, but it failed to construe the facts and all reasonable inferences that drive therefrom in the light most favorable to the appellants. The District Court went well beyond the four corners of the complaint and it made assumptions that were in direct contradiction to the allegations of the appellants. A determination of who is the primary beneficiary inherently requires fact-finding. Well, many of the cases that are talked about that you all rely on one way or the other, the trainers were performing some kind of work for the employee. By definition, your clients couldn't perform any work until the casino was open. This was all prior to the casino being open, right? I would respectfully disagree, Your Honor. They could have been performing work. They could be performing work? Of course, Your Honor. I thought that the games weren't open until the date certain afterwards. They were, Your Honor. The games weren't open. But purposely in the statute, Congress did not define what work is because it's a factual determination. Well, the job that they were training for was to work on those games, right? Correct. And those games were not open until after the training period. Those games were not open, Your Honor. Correct. Okay. So there we are. So by definition, are you out? That seems to be what the gist of the other side is saying. Well, I understand, Your Honor, that's what they're claiming, but they're incorrect. What is your best case for saying that it's not so? Well, I think there's two cases. I would argue that in this court in Ensley, the court ruled that it goes to what if the training was sufficient for it to be transferable. But I understand your question, Your Honor. This isn't really a case of first impression. There's no cases in which any court weighed whether or not there was work when the business had not yet opened. What the work that they were doing is they were learning the skills in order to become Maryland Live employees to perform on the day that the casino opened. The casino was to open, or not the casino, but the table games, were going to open 10 days after this training period. And as appellees acknowledged, they didn't look for a workforce outside of this. So if these individuals didn't go to this 12-week class and learn the skills that Maryland Live needed them to learn in order to open up the table games, then on the opening night, there would have been no table games. There would be no business. The operation would close. So that's why we argue and why I think it's the case that they were the primary beneficiary. This is a first impression because, you know, as in other cases, all the cases cited by appellee, appellant, by the court, this is the only case in which a court dismissed the case on a motion to dismiss. It's determining whether it was... Yes, but it's also the only case where, by definition, the work that these people were being trained to do could not take place until after the training. Well, Your Honor, I respectfully disagree in that. Okay, so tell me another case. I thought you just told me that this was the only case like that. I thought we were on, you know, I thought we were in accord on that. We agree that there's no other case in which this scenario arose. Right. And that's the reason why I stated to the court that there is no definition of work. Because in Walling, the court was concerned that there would be situations in which there would be situations in which employers would set up systems or processes which would try to evade the intent of the FLSA or the wage laws. And this is one of those situations because the work... The complaint is scanty, and the response is certainly scanty. I mean, I don't understand exactly why nobody made a motion for summary judgment, but no one did, so we're left with the record as we find it. Were representations made to these people that they would be paid during the training period? No, there were not representations, Your Honor. And, in fact, they were told, I think you do plead this, that the training was free. Yeah, it was free. It was job training, Your Honor. That's what we argue. And they weren't required to go to work at this particular casino after their training, were they? They could have taken their skill set elsewhere. They were not required to go to Maryland Live, but in the allegations and the complaints that the skill set was insufficient in order to take to another casino. I mean, you would have to make the finding, a factual determination that there was value to this case and it provided them with a transferable skill to work in another casino. And there is no evidence in the record of what was taught. There's the allegation that what was taught... Well, why isn't there any... There aren't even any allegations about what was taught. Well, we... What was taught? Well, we don't know, Your Honor, at this point. Well, you... Have you ever talked to your clients? Of course.  Well, Your Honor, we... In the complaint, we didn't want to make conjecture of what the actual provisions of the course were because what we had argued was that... And what we presented was that mostly what they were taught was how to be an employee of Maryland Live. These course materials, without discovery in this case, the course materials, there's no indication of what was in there. I mean, the page one of the course materials could have been, make sure to smile a lot. Page two is, make sure to tell people that she's... You have a client, right? Yes, Your Honor. And the client... You have three clients here. Yes, Your Honor. Two of them didn't complete the course. One of them did. And so that client can tell you what that person did. It was a long course. I mean, actually, I'm startled that we don't know what the work was. Well, Your Honor, the work is that they were producing a workforce, a labor force, so that Maryland Live could open its doors. I know what the company's work was, replacing... What was your client's work? Your Honor, the work was that these individuals were learning skills in order to become Maryland Live employees. And what were those skills? Those skills were to greet the customers properly. Those skills were to learn how Maryland Live wanted them to interact with customers. And there probably was, obviously, some teaching of cards. But the thing is, Your Honor, is that when you look at the Comar regulations, there aren't specific indicators of what exactly needs to be taught. It says that they need to provide a course to its dealers, their employees, on certain subjects. And none of those talk to or address, specifically, these are the games that you need to know, and here's what you need to know about those games. What happened here was that they created this course. And as we talked about, they were employees from the first day, Your Honor. I mean, they talked about Howard Weinstein, the vice president, said we have 9,000 resumes and we have 3,000 interviews. And these people went to the interviews. They were interviewed, they were given a math test, congeniality tests. Do you think that makes a difference? Oh, I do, Your Honor. Does that distinguish you from an educational institution? They have so many applicants and they admit so many people. As a matter of fact, the more you refuse, the higher your rankings are. Well, Your Honor, I think that if you look at community colleges. But you do realize you have to distinguish yourself from educational because otherwise students would be required to get wages, correct? Of course, Your Honor. And don't you have to allege enough that we know that this is work and not just an educational curriculum? Well, we did allege this is work, Your Honor. I understand the court is a nontraditional definition of work, but this is specifically why there is no definition of work. Because if you look at the situation... That's all the more reason Judge Bontz is asking you why didn't you allege things that looked like work rather than pedagogy or curriculum. We did allege things that looked like work. Like what? How to smile? They were paid minimum wage, Your Honor. For certain days during the course, they were paid minimum wage. You don't pay minimum wage to someone who's not your employee. I thought you would start that way. They defined it themselves. They gave them wages. Right, Your Honor. I mean, if you give someone wages, you don't give wages to someone who takes a community class. That's your strongest point. They defined it themselves as work in the fact that they gave them wages. Colleges don't give people wages. Exactly, Your Honor. And also, they drug tested these individuals, which is part of the application process for a gaming license. But people who fail the drug test... But see, lots of those things are preliminary to work. Right, Your Honor. But if this was to the benefit... Like drug tests. If this was to the benefit... If the primary beneficiary was the person in the program, there would have been absolutely no reason to dismiss someone from the program if they failed the drug test. You only dismiss them because they're your employee and they're no longer eligible for your employment. You don't want them as your employee anymore. There's no evidence that they couldn't have worked at another casino if they tested positive for, let's say, marijuana at the beginning of the course. There's certain states where marijuana... Have you alleged that two of your people were dismissed because of drug tests? No, I didn't, Your Honor. They weren't dismissed because of drug tests. So, I mean, sort of taking your argument and turning it the other way, it would seem that they left for no reason at all. Well, we don't know the reason at this point. Well, they know the reason, and they're your clients. Right, but, Your Honor, if you look at the standards, I think, Paul, and other things of what needs to be in a complaint, it needs to be more than mere allegations. And this is an incredibly detailed complaint in which we lay out numerous reasons why this was work, first of all, and why the appellants were not the primary beneficiary. Once we allege that the course was insufficient and that it didn't teach transferable skills, by its nature, determining who is the primary beneficiary is a fact-finding mission, which is not appropriate on a motion to dismiss. Your Honor mentioned a motion for summary judgment. The Court mentioned why it wasn't a summary judgment filed. But the key thing is it wasn't. This wasn't a motion for summary judgment. It was a motion to dismiss. And the Court went beyond the four corners and made, I think, incredible assumptions. I mean, the Court went to what the COMAR regs say, and that this proved that what was taught in the course was sufficient for there to be transferable skills because of the nature of what the COMAR regulations were. Well, there's no evidence of what was taught in this course. We have one Supreme Court case here, right? Yes. Portland Terminal. Aside from the length of the training period, how do you distinguish it? Well, I distinguish it in a number of ways. One is that in the cases in addition to the Supreme Court case— No, no, no. I want you to talk about Portland Terminal. Okay. I distinguish it in that this was a course that was only offered one time. Once they produced their labor force, it was not offered again. How does that help you, necessarily? Well, because the nature of what the FLSA has talked to is that you don't want to discourage an employer from offering a course which creates a labor pool or which is to the benefit of the appellant. But in this course, they weren't creating a labor pool. If you take everyone who's in the course and transition them to the casino floor, that's not a labor pool. That's a necessity. There's an immediate benefit to which the casino got because it wasn't going to be able to open its doors. The other way that I distinguish it is that they needed a workforce quickly. In the Supreme Court case, those were a group of break-men. They didn't need to hire any of them. And they actually— Is it clear that they couldn't hire— I thought it was sort of a taken thing that they could hire from other casinos out of state, their own casinos. Well, in Appelli's response, they say that they chose not to look out of state or look for other employees. This was the sole source, and that's what he alleged, of their labor pool. So if not a sufficient number of these people were— If I may just finish. Sure. If not a sufficient number of these people were trained how to be dealers at Maryland Live, they wouldn't have been able to open the doors. It's the supreme benefit to the employer. I mean, there's no other larger benefit that you can get than to be able to conduct your business. Yeah, but the problem with that is that if you go to the cases, and indeed the Supreme Court case, they say that that would mean in every training the benefit is always for the employer. And we know that. The court said that's not the case. That's not. Just getting the person a job, just giving them the training, doesn't make it be— the equation being it's more benefit to the employee than to the employer than to the employee. May I answer that? Sure. Okay, thank you. In Walling, when you look at it, yes, it's not always going to be— it's not simply whether they get a benefit. It's not a sole beneficiary test. It's the primary beneficiary test. And here in those other cases, all those training cases in Walling and others, there's no dispute to the validity of the training program and what was taught. Like in American Airlines, for instance, both sides agree that what was taught was similar to what would have been taught in another community college or another course, and that what was taught was actually beneficial to the student or to the trainee. What we have differently here is there's an allegation that this was not a transferable skill that was taught, and that makes it fundamentally different here because the purpose is different, the necessity is different. And once we make that allegation, because, again, this isn't a summary judgment. It's a motion to dismiss. Okay. Thank you. We'll hear from the other side. Thank you. Good morning, Your Honors. May it please the Court. My name is Todd Horn. With me is Lillian Reynolds. We are counsel for the Epley PPE Casino Resorts LLC. This is a case brought by three students who attended a 12-week school sponsored by Maryland Life and Anne Arundel Community College. Well, the allegation, the complaint, is that Anne Arundel Community College didn't have anything to do with the course, that it was taught at a shopping center, and you filed a motion to dismiss. So you take the complaint as it stands, right? Yes. I believe that they did allege that Anne Arundel Community College was part of it, although there are no allegations concerning their role. You said it was advertised as being part of, with community college, but in fact the community college had nothing to do with it. It was held in a shopping center. That's the allegation. Yes, and for purposes of our motion, we will assume that to be true. Right. In this school, they learned how to deal table games, casino table games, craps, blackjack, roulette, and the like. The heart of the complaint is the students must claim that they must be paid wages for the time they spent in the classroom, even though, at the time, the casino was not operating those table games, and in fact was not even licensed by the state of Maryland to operate those games. The plaintiffs do not allege that they dealt a single hand to a single casino patron who wagered a single dollar while they were in school. Why did they pay people for the last two days? They paid the people for the last two days because for the last two days they were employees. Oh, they weren't? No, no. They weren't dealing any hands? The casinos weren't open? Everything you just said was the same the last two days of the training? Your Honor, the casino was open. The casino has been open for a long time. No, no, no, in the last two days of the training. I thought by definition, the training was all the training took place before the casino was open. Before they were able to... table games were open. Right. Right, I beg your pardon. Before the table games were able to be operated. But for the last two days of this extended period of training, these trainees were paid. Yes. But they couldn't deal the games. They were not paid to deal hands. They were paid because at that point they had finished the classwork and they were in the orientation program. And under the casino's rules, if you are going to be subject to specific casino orientation, we're going to pay you. But in this case, Your Honor, they're talking about the classroom. You know, the 11 and three quarter weeks prior to those two days. It's still just a 12 week course, right? Yeah, it went from... Nobody told them you're going to be paid for the last week and not for the previous 11 weeks, right? Correct. Correct. But in this case, the case turns on whether during the time they were taking the classes at Marley Station Mall, learning that they were employees and that they were paid. And we have not seen a single case and plaintiffs have cited none where students, trainees, interns or other similar types of folks must be paid for time where they performed no work. Well, the statute doesn't define work. No, it does not. And Portland Terminal doesn't define work. It defines it in this... It is defined by the nature of the particular job. Well, why can't training for a job be regarded as work? Well, in Portland Terminal... In our case, in the Fourth Circuit case, that's where we are now. Well, what you would have to do... We said that, in fact, the training there could even work. In Ensley. Okay, in Ensley, it's easy to see what work is in that situation. It was a snack distribution company and these folks were operating around. They were driving trucks. They were loading and unloading snack food. They were stocking merchandise in stores. They were collecting feeds. That, in that context, was work. Well, we don't know, because of the way this has been pled and because of the fact that you haven't moved for summary judgment, we don't know what these people were doing. Well, Your Honor, it is... They were doing something that they had to do for 12 weeks. The last week, which you just revealed now to me, which I didn't realize... I don't think it's in the papers, that the last week was work, even though the previous 11 were not. No, Your Honor. It's two days. Okay, the last two days were work. But does... I thought that the whole allegations are about the 12-week course. I thought your client advertised this as a 12-week course. Yes, Your Honor. It was 12 weeks. Not 11 weeks and 3 days. Yes. Okay, but still, focusing on that, the plaintiffs... First of all, two of the plaintiffs weren't even there in the last two days. They left before that. Only one was. So if you take that one plaintiff, he does not allege for those two days he was paid, he was shortchanged. So for him, he still has to show for the previous time for the 12 weeks, I was doing work. I was doing something that resulted in the casino being the primary beneficiary, and there's nothing there. And you're right, Your Honor. It is... Except that the casino couldn't open without employees, and it got the employees from this training program. I mean, it goes both ways. Earlier, you said they couldn't have been doing work because the casino wasn't open. But the casino couldn't open without them. Well, it couldn't open until the state of Maryland gave them the license, and that license didn't kick in until after the dealer school, until April 11th. They could have, if they chose, have recruited experienced dealers from Atlantic City or Vegas or anywhere else. They chose to have Maryland citizens and local citizens populate these positions, which is why they had the school. Were the trainees told they weren't going to be paid? There is nothing in the complaint to indicate that, Your Honor. It is silent. And that's why we move to dismiss. The allegations concerning the... Well, it seems to me that would be a helpful allegation for you, not for them. I can understand why they wouldn't put it in the complaint. But it's their burden. It's their burden to... It's their burden to state a cause of action. And part of that burden to elicit sufficient facts to show that they are employees... To get the action dismissed is your burden. And we believe that Judge Blake adhered to the Supreme Court's decision in Walling, this Court's decision in Ensley, as well as the standards articulated by the Supreme Court for ruling on a 12b6 motion. Since it is their burden to establish an employee-employee relationship and their burden to establish work, we did not have to come forward with facts to show what was going on in the dealer school because they did not. They needed to come forward. And we've had now five opportunities for the plaintiffs to identify what they did that constitutes compensable work during dealer school. It's not in the complaint. It wasn't in the motion dismissed pleadings. It wasn't in their briefing. And for the first time, I hear this morning that the work was smiling and learning how to grieve folks. I think all those arguments are fair. But by the same token, we've had a lot of opportunity for you to come forward with what this training program involved and why it was legitimate. And we found for the first time this morning, at least I've heard for the first time this morning, maybe I haven't read this record sufficiently, that you acknowledge that some of the days in this extended training period were, in fact, work. So it seemed to me that the best case you had, the best argument you had was that by definition, these people couldn't have worked because the table games weren't, the casino wasn't able to offer the table games until after their training program. Now you've told us an argument that, in fact, they did produce two days of work before that date. Your Honor, let me clarify that. Because the table games were not operating on those two days where they were paid. Right. They were paid because they were doing orientations. I understand what you're saying to me. What I'm saying to you is that I thought prior to that, prior to the acknowledgement that they, in fact, were doing the work then, that the argument had simply been that table games weren't operable. They couldn't possibly be doing work. There was no work to be done. I agree, Your Honor. Well, there still was no work to be done in those two days by your same definition. We still have no allegations or even clarification from counsel what was the work being performed during the 11 and three-quarters weeks. All we have is they were smiling. But were they learning how to smile in a classroom? Okay. That's not compensable work. Were they learning how to... You know, you... As we talked about earlier, the nature of... And what were they learning in the two days of orientation that you paid them for? It was standard pre-employment orientation where you would learn... What is that? The policies and procedures of the workforce. Many employers pay employees for orientation to avoid lawsuits. So what did they do during the prior weeks? Well, they attended school at Marley Station Mall where they learned how to deal table games. Okay? And I respectfully disagree with the characterization that Judge Blake inferred what they were taught. Okay? What she held in her decision is the plaintiffs gave not a scintilla of evidence showing work performed. They merely... They don't have to come up with any evidence. All they have to do is make allegations. Right, but they can't make a threadbare allegation without supporting basis. And the central feature here is what was the nature of the work performed during this 11 1⁄2 weeks? Because they admit it was in school. They admit that the casino wasn't open. They didn't even have the personal licenses to work. I don't think they have... They didn't have those during those two days when you paid them either. Yes, but if they are talking about operating table games, they can't allege, don't allege, that they were working table games. I think that's undisputed to use the summary judgment term. So what else is there? They have not identified work performed, and that is their burden as part of their getting out of the gate to get the case going. Now, what Judge Blake talked about as far as the training protocol is she took judicial notice of the Code of Maryland regulations that deal with how to run table games. And I brought them. They are cited in the brief. They are extraordinarily detailed. So it's your representation to us that they memorized those? It's my representation to the court that they were exposed to these as part of the process. You can't operate... That sounds like summary judgment material to me. It's not needed for purposes of our motion. Okay? Because again, but what Judge Blake held is that... I bet I could give you a quiz on those and you wouldn't be able to. I will not accept that challenge because you'll win. Probably not even with 11. These are so detailed. They tell you how many times the roulette ball must rotate before it's valid. They tell you what do you do if you're dealing blackjack, everyone has a full hand but you accidentally drawed another card. The dealers are like referees in a football game. They just don't deal cards and count chips. They have to enforce and watch the rules to make sure they're done properly and the rules are detailed. And what Judge Blake said is because this is such a regulated industry, it is implausible to believe that the dealer school touched anything other than these regulations. But it's important to note that she did not make a finding in that regard because she said I don't even need to consider the regulations because the plaintiffs still have not identified any work that was performed during this dealer school where they were attending classes at Marley Station. The district court would say that's a per se rule if the employer's business could not operate, could not operate, no matter what you do, how beneficial it is, whatever is general or specific, it can never be work. That's a per se rule. That's what you're asking this court to rule? No, Your Honor, I'm not. It would have to be. You said that you can't open. So all those things are very detailed. But you're saying the key is they can't open no matter what they did. Even if they gave great details about how to count cards. I'm not counting cards, but to deal the cards. I'm sorry. I'm sorry. To deal cards and do the roulette and all those things, you're saying it doesn't make any difference if they allege them because they couldn't open. That's the line in the sand. That's what you just said. Your Honor, let me clarify. I'm not saying there is a per se rule that trainees can never become employees for a business that is not operating yet. What else do you have here? Well, here you... Here's an example. Let's say you have a company that will begin selling televisions on January 1. If in the prior months it gets a bunch of trainees to assemble those televisions and they're just putting them together under the guise of a training program, but they're really doing work assembling TVs. In that situation, the trainees would have a plausible claim that they were performing work even though the business wasn't open. We don't know what these people were doing. Precisely. Nobody will tell us. Well, and it's... That is a gaping hole that is their burden to fill in which they haven't done. Well, they said they were doing work and they outlined a bunch of things that they're doing and you've accepted what they've said. But I disagree that they've identified a bunch of things. You don't think like what they've outlined is work. But how can we judge it? Well, Your Honor, respectfully submit that they have not identified anything that is work. They haven't indicated anything. And it's... But you did. You identified two days' worth of work. We identified two days' worth of orientation and that is in the complaint. The complaint specifically alleges that one of the plaintiffs was paid for the last two days. Yeah. Orientation doesn't produce a product either. Your Honor, many companies focus on one of the factors dealing with... If you're dealing with something so specific to the company, they're going to pay them. And there is case law that suggests that. That's the goodness of your heart rule. We can't go by that. I mean, maybe you became generous at the end but that doesn't mean what they were doing from the beginning wasn't wages because you decided not to pay them. Your rule doesn't translate well with the service industry. For example, you gave the Supreme Court  of the doubt. That's really the bread and butter of your industry, getting people to come in, feel good, gain, and run the game. That was all for your benefit. This was not a reserved labor force. You needed them, day one, to go in and work for you. Yes, Your Honor, that is correct. But in the Supreme Court's walling decision in focusing on whether the employer is the primary beneficiary, they look at whether the benefit was immediate during the training. Here,  would be, at best, prospective after they started working. And they have cited no case where the having a qualified labor pool to begin working constitutes an immediate benefit. In fact, the Supreme Court directly considered and rejected that question in the walling decision. It held that having developing a qualified labor pool for future employment is not the immediate benefit that satisfies it. Your Honor, this conversation is helpful because if we look at all the cases that have talked about this issue, not one case has ever ruled that a trainee is entitled to compensable time if they perform no work. It just, if you have a school environment such as here, it's work. But see, you go back to, they say this is work. I mean, I can certainly understand why you might not want 12 weeks of going to this place in the shopping center and it doesn't seem like fun. Does it seem like fun to you? I mean, you know, so if it's not fun and you're getting a job because you do it, it's work. The statute doesn't tell us it's work. No, but if you look at the cases that discuss this issue, they look at the particular job at issue and that they look at the tasks performed. In the H&R Block case, the quote work was tax preparation. In the Donovan case for airlines, it was learning how to be a steward or stewardess or flight attendant or reservation. And they were able to say, okay, in this job, the training program was tell me, show me, watch me. Tell me what to do, show me what to do, watch me do it. Okay? In the third category, watch me do it, that's where you can potentially have work. And in many cases, Walling in particular, the trainees actually performed productive work. They identified the work they performed and even then, the court said, that's not enough to be employees because most training programs have the show me element where you are going to be hands on doing the actual job so you can learn how to really do it. And it only becomes where that show me part becomes the  the dominant part of the equation where it just swallows up the school, the education, that it becomes, that they become an employee, that the employer is the primary beneficiary of that. And we don't have any allegations. All we have is allegations of the school and a threadbare skeletal reference, conclusory reference to work. And we submit under the Twombly decision, that is not even, doesn't even nudge it close to the line of plausibility to demonstrate that they were employees during the eleven and three quarter weeks or that they performed work. And Your Honor, I'm running out of time. Unless you have any further questions, I will just request that. Thank you for your time. And I will ask that this decision dismissing the case be affirmed. Thank you. Thank you, Your Honors. I think it's a perfect analogy when you asked about the service industry, Your Honor. And that's one of the things I think is completely analogous is if you're going to open a bar or restaurant, you have an opening date in which you're going to open that bar or restaurant. You're going to have people learning how to make drinks. This is all work because without it, the bar or the restaurant can't open. I don't think anyone would argue whether or not that's work simply because you aren't producing. The appellees would like you to take a definition of work and essentially that you're building something on an assembly line. You have a definition of work. And that's what we have here. These individuals, as Your Honor pointed out, went to a 12-week class in which they took buses, they needed child care. Now, in all of these other cases, the court came to the conclusion that it was a valid course, that there was sufficient information taught. What are the best allegations in your complaint that what they did during that 12-week period was work? What are the best allegations in your complaint of work performed during that 12-week period? Well, the acknowledgement by appellees that they were paid. Yeah, but let's go to your complaint. Okay. And maybe you can tell us the allegations in your complaint. Well, the allegations, Your Honor, that these individuals performed work by learning how to deal cards at Maryland Live to produce the product of a trained labor force so that on a date certain, appellees would like to say that this was prospective. It wasn't. Ten days after this course ended, the doors were going to open, the curtain was going to rise, and there was going to be a show. There was going to be the casino's entertainment was going to be presented. And ten days later, after this course, if the product of a trained  had not been achieved, they wouldn't have opened their doors. No greater benefit to the appellee. And the appellee has presented to Your Honor that these were employees. So why could they have been employees the last two days and not be employees the other days? This is certainly a question of fact. I mean, I think,  you could find that they were employees the entire time, because there's nothing that states what was different on those last two days, what transformed trainees into employees on the last two days. I don't know, maybe appellee realized they were violating the law. Maybe they realized that they wanted to encourage these people to make the transition from the program to the casino floor. I mean, we're not sure why they did this, but in paying them minimum wage, which is the minimum wage they  they were able to make the transition from the program to the casino floor. Most importantly, what goes to whether or not the course was valid or whether it taught sufficient information for it to be transferable is it was alleged in our complaint that individuals who failed the proficiency tests were still advanced. So not only have we alleged that the information was insufficient, but even if they didn't learn the insufficient information, they still were moved on because they were so desperate for a workforce because otherwise they wouldn't have been able to open their doors. And that's what differentiates us here. And you talked about this earlier that the applicants work there did not necessarily expedite the company business but may have sometimes actually impeded it. You know, what we have, and if you look at American Airlines and you look at Petrovsky, you'll hear you have every single person who went through the training program regardless if they learned anything or anything that was taught. You see this big binder, but there's no evidence. It's a factual question. Did they learn this? Were they tested on it? You look at the Comar regulations, there's no test that has to be given for individuals in the past to say they're proficient in dealing cards. You know, you asked whether or not we said what was the content of that  And you're right. We did. In conclusion this was the founding of Maryland Live. We did the training course. They took the steps needed in order to fill out employment documents. What we had here was a human resources department in the shopping mall. They were learning games and how Maryland Live wanted them to interact with the employees. They were doing the necessary steps in order to be ready on the day the casino opened. You're saying that filling out the forms was work? I'm just trying to get you to tell me what you're saying. Filling out the forms is work? Taking a drug test is work? Not taking a drug test. Moving along the employment process. These things were not to the individual benefit. The employer needed them to be ready. Before I had steady work, I would fill out employment forms and not be employed. I didn't think that I could get reimbursed for filling out the forms. Counsel, why do you keep leading with a glass jar? That goes right into the orientation. Doesn't it help you that your allegations are augmented by the court's judicial notice? You got the benefit of that because now it's incorporated that you did all of those things that were necessary in the manual. We're here on 12B-6 but the court almost tried to make it into a rule 56 but didn't but said I'm incorporating that so you said it's enhanced. But when you're talking about processing and HR things, that's not the work part. You learned technically how to deal with the cards, handle all the games, all those things in the   not the work part. The reason I answered in that way was I was assuming what was in the opinion. I was trying to go beyond that. I could only find one paragraph that seemed to meet the alleged work. The course was centered on plainness and  think that's another similarly situated learning blackjack craps roulette. That's what I read when I first came up here. I believe it's sufficient. At that particular casino. How to do it for Maryland live. That's what I did. When I applied for jobs, I never got a direct deposit form. That would have told you you had a job. Here they gave W-2s and direct deposits before they finished the class. You only do that with them. I'm sorry your honor. They didn't give you an example of the paycheck you could get. There were sufficient facts that should have been a factual determination. It could have been a factual determination of work. We believe it was work because they admitted they were employees. There should be a primary beneficiary which this court adopted. In order to do that you have to  primary beneficiary. I think we understand your position. Thank you your honor. Thank you for your argument. We'll come down and greet the lawyers and go directly to our last case.
judges: Diana Gribbon Motz, Roger L. Gregory, Stephanie D. Thacker